Civil action. The plaintiff was incorporated by a special act of the General Assembly, ratified on 16 February, 1909, it being Private Laws 1909, ch. 76, and was organized on 25 May, 1909. It was given by its charter numerous and comprehensive powers and capacities, and, among others, the right "to carry on any and all business in any wise appertaining or connected with the manufacturing and generating, distributing and furnishing of electricity, compressed air, gas, or stream, for light, heat, and power purposes, including the transacting and conducting of any and all business in which electricity, compressed air, gas, or steam is now or may be hereafter utilized, and all matters incidental or necessary to the distribution of light, heat, and power; to manufacture and repair, sell and deal in any and all necessary appliances and machinery used or which may be acquired or deemed advisable for or in connection *Page 303 
with the utilizing of electricity, compressed air, gas, or steam, or in any wise appertaining thereto or connected therewith; to purchase, acquire, own, use, lease, let, and furnish any and all kinds of machinery, apparatus and appliances; to purchase, acquire, own, hold, improve, let, lease, operate, and maintain water rights and privileges and water-powers; to construct, acquire, build and operate, maintain and (250) lease dams, canals, ditches, flumes and pipe lines for the conducting of water and creating power; to acquire by purchase, condemnation, or other property methods the right to use, employ, and divert the water flowing and running in any stream or water-course, not navigable, in North Carolina, which may be necessary to the exercise of any of the powers of a public orquasi- public character herein granted to the said corporation; and whenever it shall be necessary to divert the water from any such stream or water-course to be used for any of the purposes herein provided, the said corporation shall have the right to have the value of the said water so to be diverted, and the lands so to be used over which it shall be banked, ponded, or conducted, condemned, and the value thereof assessed in the manner hereinafter provided for the condemnation and valuation of land and other property; to do all and everything necessary, suitable, or proper for the accomplishment of any of the purposes or attainment of any one or more of the objects herein enumerated, or which shall at any time appear conducive to or expedient for the protection or benefit of the corporation, either as holder of or interested in any property; and in general to carry on any business, whether manufacturing, mining, or otherwise."
It is further provided in section 8 of the charter as follows:
"It shall be lawful for the president and directors, their agents, superintendents, engineers, and others in their employ, to enter at all times upon all lands or water for the purposes of exploring or surveying the lands and water required by said company for the location of any of its works, or for the conducting of the business, or any part of said business, hereinafter authorized in paragraphs a, b, c, and d, of section 5, and of locating said works, doing no unnecessary damages to private property; and when the location of said works shall have been determined and a survey of the same deposited in the office of the clerk of the Superior Court of the county in which the said land lies, then it shall be lawful for the said company, by its officers, agents, engineers, superintendents, contractors, and others in its employ, to enter upon, take possession of, have, hold, use and excavate and fill in such lands, and to erect all the necessary and suitable structures for the erection, completion, repairing, and operating of said works, subject to such compensation as is hereinafter provided:Provided, however, that said company shall not enter upon or break ground upon the premises, except for the purposes of *Page 304 
surveying, without the consent of the owner until such owner's damages are agreed upon between such owner and said company, or ascertained by the method hereinafter provided, and such damage has been paid to such owner; and Provided further, than such locating of its works and filing its surveys in the office of the clerk of the Superior Court (251) shall not precluded said company from making, from time to time, other location of works and filing surveys of the same as its business and its development require; and whenever any land for the location of a dam or dams, lake or lakes, or a canal or canals, or for ponding water, or any other lands or rights of way may be required by said company for the purpose of constructing and operating its railroads, or railways, street railways, or motor lines, telegraph or telephone lines, or other works, or for the conducting of the business herein authorized, or any part of said business, and the said company cannot agree with the owner thereof for the purchase of the same, the same may be condemned and taken and appropriated by said company at a valuation of three commissioners, or a majority of them, to be appointed by the clerk of the Superior Court of the county in which the land to be condemned lies, or the clerk of the adjoining county if the land lies in more than one county."
The court submitted two issues to the jury which, with the answers thereto, are as follows:
1. Did the plaintiff, prior to 21 August, 1914, survey, stake out, and adopt the locations for its dams, reservoirs, and public works on the Hiawassee River, as alleged in the complaint and as indicated on the map offered in evidence? Answer: "Yes."
2. If so, were the plaintiffs' said locations lying on 21 August, 1914, in a state of abandonment? Answer: "No; they did not."
The court then proceeded to find in detail certain facts, and in order to get a fair and full understanding of the case, as now presented, they are here set forth:
"In this case the court, deeming it necessary and proper that the facts should be found by the court upon the evidence, in addition to the findings of the jury, by reason of the nature of the case and the relief sought herein, after due consideration of the whole evidence, finds the following facts: That the plaintiff, the Carolina-Tennessee Power Company, was chartered by an act of the General Assembly of North Carolina, being chapter 76, Private Laws 1909; that subsequently, to wit, on 25 May, 1909, a meeting was held at Murphy, North Carolina, at which the charter was accepted, the company organized thereunder, by-laws duly adopted for the government of the corporation, and officers and directors elected, and the meeting of its directors was held on 28 May, 1909. That some time in July, 1909, a contract was entered into with the *Page 305 
Ambursend Hydraulic Company of Boston, Mass., looking to and providing for a survey of the water-power and lands adjacent to the streams at the point on the Hiawassee River in Cherokee County which is mentioned in the complaint. That about that time, or perhaps before, this company sent T. H. Verdell, and expert civil engineer of the State of Georgia, who went upon the ground in the spring of 1909, made surveys of the lands from about the State line between North Carolina and Tennessee upon the Hiawassee River to and about a half-mile (252) up the Notla River, where he based his surveys and ran his contour lines upon a proposed dam erection near the State Line, 150 feet high, and the second dam development near the mouth of Beaverdam Creek on said river a height of 150 feet, the surveys altogether including and actual distance, following the river of about 26 1/2 miles. That he laid out the contour lines, taking all the necessary measurements to the two dams, 150 feet each in height, located the lines upon the ground, clearing out the undergrowth at some places, where necessary, and by setting stakes from point to point along these lines of a reasonably permanent character, with the numbers and markings thereon to indicate their purpose; and the court finds as a fact, as found by the jury, that the plaintiff, for which this and subsequent work was done, did survey and stake out locations for its dams, reservoirs, and public works on the river, as alleged. It finds that Mr. Verdell made reports of the two basins, called the upper and lower, and filed the same with his maps, the last one being sent in about 18 September, 1909; same was received by the plaintiff, and copies of his maps made, and same were subsequently used for the further purposes of the company in the prosecution of this proposed development.
"That plaintiff, and those under contract with it, procured William H. Burr, expert civil engineer of high reputation, to come upon the ground about July, 1910, for an examination of the proposed properties and a checking up of the work of Mr. Verdell, and a report thereon, and that he filed a favorable report of the properties of the proposed development on 10 August, 1910, covering the same ground from the State line to the mouth of and up to Notla River. That the plaintiff took title to some of the land lying upon this stream, and contracts from other land, during the year 1910, took options in 1911, and made payments in 1912; that Mr. Elton F. Smith, for plaintiff, was upon the ground in 1910 and until he died in March, 1911, and Mr. George E. Smith, as its agent, was upon the ground in the same year. In 1912 plaintiff started condemnation proceedings, and made other payments upon its contract later on, the total expenditures made by and in behalf of the plaintiff in this and other prospects amounting approximately to $92,000. *Page 306 
"That with the aforesaid maps and other maps which were made, in connection with the minutes of the meetings of the stockholders and directors, the plaintiff did adopt the locations mentioned in the complaint, and in the answer to the first issue by the jury, in the same manner as found by the jury.
"That Mr. Ketcham and others who had the enterprise in charge in 1910, `11, and `12 were unable properly to finance the undertaking so as to bring about the development, and that Mr. Ketcham sought (253) and found, in 1912, Mr. W. V. N. Powelson, who in 1913, about June, made, himself, some examination of the dam sites and other properties, he being an expert hydraulic and electrical engineer of well known reputation. That in that year he sent others of his own surveyors upon the land to check up the markings and the location of Mr. Verdell, who reported that they found them to be correct, and that in the year 1913 Mr. Powelson, with other associates, acquired all of these outstanding stocks and bonds of the company, and he is now its president. That he made payments upon the contracts of the plaintiff and acquired some of the property in fee for it, the plaintiff, as late as 16 July, 1914, and for the price of $15,000, took a deed for a large tract of land which would be covered by back water.
"The court further finds that Mr. Edmund B. Norvell of Murphy has been active from time to time and from year to year in looking up the titles of so-called landowners along the stream with whom contracts had been made or options taken. That he passed some of them as good and some of them he held up the payments on as not being sufficient upon which to base a deed in fee.
"As to the filing or depositing of the maps in the clerk's office as claimed by the plaintiff, there is some difference in the recollection of the witness as to what actually happened, but on it all the court finds that the two maps offered in evidence showing the contour lines, and giving other information about this property, were deposited for the purpose of filing, and so filed in the clerk's office by Mr. George E. Smith in the presence of Mr. Norvell on 21 June, 1911; that they were taken out again by Mr. Norvell on 28 June, returned by Mr. Smith to the office about a week later, and subsequently taken out again by Mr. Norvell, who retained them in his office for use, in reference there, until July, 1914.
"This action was begun on 21 August, 1914, and on 13 July, 1914, the defendant company filed in the office of the Secretary of State its articles of incorporation upon which a charter was issued, and so certified and sent to this county by the Secretary of State on 15 July, 1914, and the same was recorded in the office of the Superior Court of this county on 16 July, 1914. That immediately thereupon the defendant *Page 307 
instituted certain condemnation proceedings against certain claimants to or owners of the land along this river, and in the scope of the locations of the plaintiff, declaring itself to be a public or quasi- public organization chartered for the purpose of producing electric power to be sold to the public; and that it also acquired some lands upon the stream subsequently. At the time this litigation started the plaintiff owned something like 26 1/2 miles of the water front in fee, counting it on both banks, and had under contract something like 11.96 miles, some 8 miles under proceedings for condemnation. That at the same time the defendant owned some 4 miles in fee, counting both sides of the stream, and had about 10 and a fraction miles under contract upon which substantial payments had been made and were being made; also, (254) about 11 miles under condemnation proceedings for which action had been begun. Of this last item, some 5 miles was the river front of what is known as the Fowler land, for which the plaintiff acquired a deed in fee on 16 July, 1914, the day subsequent to the one on which condemnation proceedings were begun, and 2 miles of the frontage of what is known as the Green land, to which the plaintiff had a title in fee at the time the defendant's proceedings for condemnation were begun.
"The court, therefore, finds as a fact that at no time since the incorporation and organization of the plaintiff up to the time of the bringing of this suit has the plaintiff abandoned its locations, this being the same finding as found by the jury under issue No. 2, treating it as a question of fact, if it is such."
Upon the verdict of the jury and the foregoing findings of fact the court granted an injunction substantially as requested in the prayer of the complaint, which is as follows:
"Defendant is enjoined from: (1) Purchasing or otherwise acquiring any other lands upon or along the banks of the Hiawassee River which are necessary for the works of the plaintiff as shown by marks upon the ground or the survey thereof deposited in the office of the clerk of the Superior Court of Cherokee County; (2) Prosecuting any actions heretofore commenced for the condemnation of any such lands, or commencing hereafter any actions for the condemnation of any thereof; (3) Entering upon or constructing or placing any dams, reservoirs, powerhouses, or other structures or machinery upon any such lands; and (4) Doing or committing acts or things which would interfere with the rights of the plaintiff, or the prosecution or completion of its plans and purposes as herein set forth, or which would annoy, delay or harass the plaintiff in carrying out such plans and purposes."
The court then added this clause: "In view of the fact that the plaintiff has not prosecuted its purposes and plans other than as hereinbefore set out in the findings of fact, that is to say, has neither built *Page 308 
nor begun any dam or other structures upon the lands in question, the court is of the opinion that the injunction ought not to be continued in perpetuity unless by its operations, activities, and conduct subsequently the plaintiff or its successors can demonstrate the fact both of their willingness and ability to develop the water-powers according to their plans and purposes, and that if within a reasonable time, to wit, in two years or thereabouts, the defendant can show that the plaintiff is not carrying forward these plans in a substantial way and not actually engaged on the work, it ought to be permitted to move in this case, or take other steps as it may be advised, for a review and recall of this order of perpetual injunction."
(255) Defendant, having duly reserved its exceptions, appealed to this Court.
After stating the case: The defendant has raised several objections to granting relief in this action by injunction, as there has been no violation of or obstruction to plaintiff's rights. It is especially urged that by Revisal, sec. 1573, as amended by Public Laws 1907, sec. 74, it is provided, with reference to the power of condemnation by electric companies, that the power given by this section (1573) shall not be used to interfere with any mill or power plant actually in process of construction or in operation; and further, that water-powers, developed or undeveloped, with the necessary land adjacent thereto for their development, shall not be taken, and further, "That provisions in any special charters heretofore granted, in respect to the exercise of the right of eminent domain, which are in conflict herewith, are hereby repealed." This statute was further amended by Public Laws 1907, ch. 302.
But after these acts were passed, the legislative charter of the plaintiff was granted, which, if not expressly, then by necessary intendment, gives the power to condemn water-powers, especially those lying dormant; and where two statutes conflict, the later repeals the earlier one (leges posteriores priores abrogant). 1 Cook on Corporations (7 Ed.), sec. 2; Clark and Marshall on Private Corporations (Ed. of 1903), sec. 127b, at p. 383, and Ed. of 1901, pp. 107 and 174; Lewis's Sutherland on Statutory Constr., sec. 275; Wood v. Wellington, 30 N.Y. 218.
It was insisted upon the argument that there should be express words of repeal in this act to suspend the operation of the general law, and that none such are found therein. But this is not necessary. Where a later *Page 309 
special law, local or restricted in its operation, is positively repugnant to the former law, and not merely affirmative, cumulative, or auxiliary, it repeals the older law by implication pro tanto, to the extent of such repugnancy within the limits to which the latter applies. McGavick v.State, 30 N.J. L., 510; Township of Harrison v. Supervisors, 117 Mich. 215;R. R. v. Ely, 95 N.C. 77. "The well settled rule of construction, where contradictory laws come in question, is that the law general must yield to the law special." Noy's Maxims, 19. S. v. Clark, 25 N.J.L. 54. It was held in the following cases that the general law does not apply to a corporation organized under a special charter so far as the provisions of the latter conflict with the former: Clarkson (256)v. H. R. Railroad Co., 49 N.Y. 455; Le Feore v. Le Feore,59 N. Y., 434; Hollis v. Drew, etc., Seminary, 95 N.Y. 166, 173; and our cases virtually hold the same. Holloway v. R. R., 85 N.C. 452, 455; R. R.v. Ely, supra; S. v. Perkins, 141 N.C. 797. The subject is considered by the Chief Justice in the recent case of R. R. v. Ferguson,169 N.C. 70, where the same principle as herein stated was approved.Justice Hoke, in Bramham v. City of Durham, ante, 196, goes fully into a discussion of the question as to conflicts between the general law and special charters, holding that where there is repugnance the provisions of the special charter will prevail.
The Code, sec. 701, was amended and became section 2566 of the Revisal, being confined in its operation to railroads. This was done in 1905, before the plaintiff received its charter in 1909. The Revisal of 1905, sec. 1129, recognizes the rule of construction we have stated above, as to the operative force of a special charter.
Power Co. v. Whitney, 150 N.C. 31, does not apply. It presented a very different question. There the plaintiff's charter gave it a certain right of condemnation. This was expressly amended and limited by the general law at the same session, and afterwards its charter was reenacted, "as amended." It was properly held that the charter of plaintiff was subject to the provisions of the general law. R. R. v. R. R., 106 N.C. 16, was also a different kind of case. It was held there that the general law and the special reference to the North Carolina Railroad Company's charter were inpari materia, and both could have operation. Besides, the statutes have been amended since then, as we have shown above, and section 1159 of the Revisal allows full effect to the special charter.
We cannot agree to the defendant's construction of the plaintiff's charter, as we think it has a broader sweep than is there attributed to it. It is further contended by defendant that plaintiff could not condemn property for public purposes, because it was authorized to engage in private business; but we have held that position to be untenable, in *Page 310 Land Co. v. Traction Co., 162 N.C. 314. It was there said by the ChiefJustice: "The plaintiff contends that the Piedmont Traction Company cannot exercise the power of eminent domain, because under its charter it is authorized to engage in private business in addition to its authority to operate a street railway, which is a quasi- public business. We think the law is clearly stated thus in 15 Cyc., 579. The fact that the charter powers of the corporation, to which the power of eminent domain has been delegated, embrace both private purposes and public uses does not deprive it of the right of eminent domain in the promotion of the public uses." McIntosh v. Superior Court, 56 Wn. 214; Power Co. v. Webb, 123 Tenn. 596. The company may purchase property for those (257) uses which are not public, and not resort to condemnation. If it attempts to exceed those powers and franchises bestowed by its charter, or to exercise them in an unconstitutional or unwarranted manner, the State may restrain it by quo warranto or other proper proceeding. What should be the form of it, and how and by whom it may be invoked, matters not, as the remedy in some form is ample to prevent any excessive or illegal use of its chartered powers. Land Co. v. TractionCo., supra. It will be time enough for the defendant to complain when its legitimate interests are about to be invaded. The plaintiff has not sought, as yet, to condemn or appropriate any property for private uses.
But we think the court erred in finding any facts additional to those found by the jury in their verdict. This is not a proceeding to condemn land, as contended by the plaintiff, but a civil action to enjoin the defendant from interfering with plaintiff's previously acquired right and interest in certain water-powers and lands and easements appurtenant thereto, and was tried upon issues and oral testimony, before a jury. It was not a case in which the presiding judge could pass upon the evidence and find the facts or any material part of them. The whole matter was submitted to a jury, and it was their province to pass upon all the essential issues, and to find the ultimate facts upon which the right of the respective parties depended. We know of no precedent for trying a case like this at the final hearing otherwise than by a jury, upon issues submitted to them, where the evidence is oral, unless the parties waive such a trial under the statute, and agree that the judge may find the facts. This Court said, by Justice Hoke, in Harvey v. R. R., 153 N.C. at p. 574: "Ever since the amendment to the Constitution conferring jurisdiction over `issues of fact and questions of fact to the same extent as exercised prior to the Constitution of 1868,' the construction of the amendment, in several well considered cases, has been that it does not embrace or apply to common-law actions such as this, but only to suits which were exclusively cognizable in a court of equity, and to them only *Page 311 
when the entire proof is written or documentary, and in all respects the same as it was when the court below passed upon it. Runnion v. Ramsay,93 N.C. 411; Worthy v. Shields, 90 N.C. 92; State and City of Greensborov. Scott, 84 N.C. 184; Foushee v. Pettyshall, 67 N.C. 453."
It was not regular procedure, or according to the course and practice of the court, that the facts should be found by a divided tribunal, that is, court and jury. We, therefore, must hold that the facts as found by the judge cannot be considered here. This was not the hearing of a motion for the continuance of a preliminary injunction to the final hearing, but the final hearing itself, and the judgment as necessarily one for a perpetual injunction, and the insertion of the clause reserving to the defendant the right to have reviewed or recalled "this perpetual injunction," as it is called in the judgment, by motion or (258) otherwise, did not change its character in this respect. It still remains a final judgment and a perpetual injunction. In other words, the court at the final hearing granted the relief prayed for in the complaint.
The defendant tendered certain issues, seven in number, which the court refused to submit, and in doing so there was no error, as a comparison of these issues with those submitted by the court will show that the latter substantially embrace every question or matter which is covered by the former, with one exception hereinafter mentioned. The first of defendant's issues, leaving out the date, is the same as the first of those submitted by the court, and the third, fourth, fifth, and sixth of the defendant's issues practically contain no matter which is not presented by those of the court, but are rather special inquiries as to evidentiary facts bearing upon them. The seventh of defendant's issues is fully covered by the two issues submitted to the jury. The second issue of defendant will hereinafter be considered.
Issues are sufficient when they submit to the jury proper inquiries as to all the essential matters or the determinative facts of the controversy.Zollicoffer v. Zollicoffer, 168 N.C. 326; Hatcher v. Dabbs, 133 N.C. 239. The form of the issues is of little or no consequence, if those which are submitted to the jury afford each party a fair chance to present his contention in the case, so far as it is pertinent to the controversy. Carrv. Alexander, 169 N.C. 665. Issues should be framed upon the pleadings and not upon the evidence. Goins v. Indian Training School, 169 N.C. 736.
The first issue, though, was not definite enough in respect to the time when the plaintiff surveyed staked out, and adopted the locations for the sites of its dams, reservoirs, and public works on the Hiawassee River. This is a case of conflicting claims to these water rights and easements, and it was not sufficient to inquire if they had been acquired by the *Page 312 
plaintiff prior to the bringing of this action. We are not required or permitted to examine the evidence to ascertain what the fact is, but it must appear in the issue itself as one which was found by the jury upon the evidence. The judgment is not based upon the evidence, but upon the findings of the jury from the evidence.
Besides, we think there should be an issue as to whether a map of plaintiff's location was filed in the office of the clerk of the Superior Court, and, if so, when was it done? This matter should not be left open for dispute between the parties hereafter, but should be settled by a special finding of the jury in regard to it. Important rights depend upon it, and it becomes one of the vital questions of the case. It bears, as evidence, upon other questions, it is true, but has substantial weight and influence itself as a separate and independent fact. The defendant is here claiming the ownership of some of the properties to be (259) affected by plaintiff's location, or an interest or right therein superior to the claim of the plaintiff, and while the payment of damages to the landowner may not be essential to the acquisition of a prior right or preferred location, between two rival claimants, the filing of the map is an act required to be performed by the claimant in connection with the location of his works and as a condition of his right to proceed further. If it is not required to be done for the purpose of determining the location and extent of plaintiff's claim, it is so intimately connected with it and is regarded as of such importance in the general scheme of appropriation as to call for a separate consideration and finding by the jury.
The general questions involved in this case were so thoroughly examined and considered in the carefully prepared opinion delivered by Justice Hoke
for this Court in Street Ry. v. R. R., 142 N.C. 423, that little, if anything, need be said here upon the subject. It was there held that, in the absence of statutory regulations to the contrary, the prior right belongs to that company "which first defines and marks its route and adopts the same for its permanent location by authoritative corporate action," citing pertinent authorities, and among the Lewis on Eminent Domain, sec. 305, where it is said: "Where the conflict arises out of rival locations over the same property by companies acting under general powers, that one is entitled to priority which is first in making a completed location over the property, and the relative dates of their organization or charters are immaterial." And again, in the same section: "The making of a preliminary survey by an engineer of a railroad company, never reported to the company or acted upon, will not prevent another company from locating on the same line." It appears, therefore, that what is a proper location, and what is authoritative corporate action in respect to it, so as to confer a prior or preferential right *Page 313 
of occupancy or condemnation, are questions depending very much upon the facts as disclosed by the evidence, under instructions by the court as to their legal sufficiency for the purpose of vesting the prior right in either one or the other of the competitors for it.
There are other exceptions, but not of sufficient importance to require any separate discussion of them. For the reasons stated, there was error committed at the trial, in the respects indicated, and for which a new trial is ordered.
New trial.
PLAINTIFF'S APPEAL.