UNITED STATES ex rel. TENNESSEE VALLEY AUTHORITY *v.* POWELSON, ASSIGNEE AND SUCCESSOR IN INTEREST OF SOUTHERN STATES POWER COMPANY et al.

No. 3.   Argued March 12, 13, 1942.   Reargued March 1, 2, 1943.— Decided May 17, 1943.

*Solicitor General Fahy* and *Mr. William C. Fitts, Jr.* made the original argument for the United States; and *Mr. Fitts* the reargument. *Messrs. Arnold Raum* and *Charles J. McCarthy* were on the briefs.

*Messrs. George Lyle Jones* and *George H. Wright* argued the cause on the reargument, and *Mr. Arthur T. Vanderbilt* on the original argument, for respondent.

Mr. Justice Douglas delivered the opinion of the Court.

This case arises out of condemnation by the United States on behalf of the Tennessee Valley Authority of about 12,000 acres of land in North Carolina lying in and along the Hiwassee River, a major tributary of the Tennessee. The land involved in the case was owned by the respondent Southern States Power Company, a North Carolina corporation, and by its wholly owned subsidiary, the Union Power Company, a Georgia corporation. Since condemnation, the Southern States Power Company has assigned its property interest and rights arising out of these proceedings to the respondent W. V. N. Powelson, its sole stockholder. For convenience Powelson and Southern States will be referred to interchangeably as "respondent."

On January 28, 1936, when the original declaration of taking was filed and these proceedings began, Southern States and Union Power owned a small hydroelectric generating plant on the Nottely River, a tributary of the Hiwassee. This was known as the Murphy plant. It had a distribution system which supplied the town of Murphy, North Carolina, and surrounding territory. These companies also owned about 22,000 acres of land on both sides of the Hiwassee and Nottely Rivers. These included lands at four dam sites which are known as the Powelson (site of the Hiwassee dam), Appalachia, Murphy and Nottely sites, a large part of the land required for the Powelson and Appalachia projects, and some of the land required for the Murphy and Nottely projects. Powelson, an experienced hydroelectric engineer, began as early as 1913 and continued until 1931 to explore, survey, and acquire these lands and to develop and promote a plan for constructing an integrated four-dam hydroelectric plant on these rivers and at these sites. The actual cost

of the lands involved in this case, as distinguished from the total investment in them,[1] was $277,821.56.

Southern States is successor to Carolina-Tennessee Power Co., created by a special act of the North Carolina legislature[2] in 1909. Carolina-Tennessee was granted broad powers and was authorized by the State to take by eminent domain riparian lands and water rights along any non-navigable stream of North Carolina.[3]

The lands condemned by the Government in the present proceedings constitute a part of the site of its Hiwassee dam, a multiple-purpose project constructed by the Tennessee Valley Authority on the Hiwassee River as part of the development of the Tennessee River system for hydroelectric power production, navigation, and flood control. See Report to the Congress on the Unified De-

---

[1] The sum of $1,061,942.53 had been invested by respondent through 1935 in the entire 22,000 acres of land owned by it. Of this sum Powelson personally contributed $586,196.21. The total expenditure included $188,271.86 for lands not condemned, $73,412.68 for taxes, $82,480.81 for New York office expense, $94,074.71 for legal expenses, $14,321.68 for travelling expenses, $64,358.46 for construction of transmission lines for and operation of the Murphy plant, $194,487.50 for interest and amortization as respects the bonds on the Murphy plant, and expenditures for surveying, engineering studies, advertising and furniture.

[2] N. C., Priv. L. 1909, c. 76, p. 185.

[3] A rival, the Hiawassee River Power Company, organized under the general laws of the State, proceeded to acquire lands and rights by contract, deed and condemnation, and threatened to construct a hydroelectric plant on the Hiwassee River which would interfere with the development projected by Carolina-Tennessee. Carolina-Tennessee engaged in a long litigation to establish its rights as against its rival. That litigation established the prior and dominant right of respondent's predecessor to develop the water power in this territory and sustained its claim to condemn the land and water rights of the Hiawassee River Power Company. *Carolina-Tennessee Power Co.* v. *Hiawassee River Power Co.*, 171 N. C. 248, 88 S. E. 349 (1916), 175 N. C. 668, 96 S. E. 99 (1918), 186 N. C. 179, 119 S. E. 213 (1923), 188 N. C. 128, 123 S. E. 312 (1924).

velopment of the Tennessee River System, Tennessee Valley Authority, March 1936, pp. 18–20, 96, 99. The dam itself is situated on land acquired from the respondent and known as the Powelson site. It was stipulated that the Hiwassee River is not navigable at the, site of the Hiwassee dam or in any part of its course through respondent's land.[4]

The property condemned includes the Murphy dam and hydroelectric plant on the Nottely River and about 12,000 acres of land along the Hiwassee River in North Carolina. Of these, some 2,000 acres have been cleared and cultivated. The remaining area is rough and mountainous, consisting in large part of rock surface, mountain peaks and gorges. Much of the land was inaccessible at the time of the taking, there being practically no highways thereon, although there were some cartways.

The condemnation proceedings were conducted pursuant to § 25 of the Tennessee Valley Authority Act of 1933, c. 32, 48 Stat. 58, 16 U. S. C. § 831x.[5] Under the procedure therein specially prescribed for condemnations on behalf of the Tennessee Valley Authority, the District Court appointed three commissioners to take testimony and to determine the value of the property. The Government contends that the property was worth from $95,000 to $165,000. Respondent sought to establish a value of $7,500,000. Respondent's valuation was based on the theory that the property condemned, together with other property owned by respondent, could be united with numerous other tracts owned by strangers for the construction of an elaborate four-dam hydroelectric project. Only one of the four projected dams was to be located on the

---

[4] And see Tennessee River and Tributaries, H. Doc. No. 328, 71st Cong., 2d Sess., p. 216.

[5] See also, 46 Stat. 1421, 40 U. S. C. § 258a; § 4 (h) (i) of the Tennessee Valley Authority Act of 1933, 48 Stat. 58–61, 16 U. S. C. § 831c (h) (i).

property condemned, viz. at the site of the Hiwassee dam, which, taken alone, was not considered commercially feasible for power development. The Commission found that the land condemned was suitable for use as the site of a hydroelectric power plant; that such use furnished the basis for its greatest inherent value; and that it had a value of $1,437,000,[6] though its cost was only $277,-821.56. The Commission awarded $253,000 in addition as severance damages in respect of lands not condemned but remaining in the ownership of Southern States and Union Power.

Both parties sought review of the award before the three-judge District Court for which § 25 of the Tennessee Valley Authority Act makes provision. The District Court reduced the value of the land condemned to $976,289.40 and severance damages to $211,791.23, $100,000 of which was for the Murphy distribution system. Interest was added from the filing of the initial declarations of taking. 33 F. Supp. 519. The Circuit Court of Appeals excluded severance damages for the taking of the Murphy plant on the Nottely River; and also excluded the $18,907.02 awarded as severance damages with respect to land held by Union Power unless within thirty days after the mandate was filed in the District Court that corporation should be made a party so as to become bound by the judgment. With these modifications it affirmed the judgment of the District Court. 118 F. 2d 79. The case is here on a petition for writ of certiorari which we granted because of the public importance of the issues raised.

I. A preliminary question relates to the scope of review by the Circuit Court of Appeals under § 25 of the Act.

---

[6] The Commission also awarded $110,000 for the Murphy plant, which sum had been deposited by the United States when it filed its declaration of taking.

That section provides for the appointment of commissioners, who are "to examine into the value of the lands sought to be condemned, to conduct hearings and receive evidence, and generally to take such appropriate steps as may be proper for the determination of the value" of the lands. The commissioners are required to report such value and make an award. Review of the action of the commissioners is by a three-judge district court, which "shall pass *de novo* upon the proceedings had before the commissioners, may view the property, and may take additional evidence. Upon such hearings the said judges shall file their own award, fixing therein the value of the property sought to be condemned, regardless of the award previously made by the said commissioners." There is an appeal from that court to the circuit court of appeals, which "shall upon the hearing on said appeal dispose of the same upon the record, without regard to the awards or findings theretofore made by the commissioners or the district judges, and such circuit court of appeals shall thereupon fix the value of the said property sought to be condemned."

It is contended that the Circuit Court of Appeals did not perform the functions which § 25 placed upon it. That court stated that § 25 permitted it to consider the findings under review "in the light of the record." 118 F. 2d p. 83. It gave weight to the opportunity of the commissioners and judges who took the testimony to see and hear the witnesses. But while it adverted to those circumstances and findings, and modified and "affirmed" the judgment of the three-judge court, we cannot say that it did not perform the functions which Congress gave it under § 25.

The purpose of § 25 was to free the Circuit Court of Appeals from the strictures commonly applicable to its review of disputed questions of fact. Under § 25 it does not sit as a "court of errors." *United States* v. *Reynolds,* 115 F. 2d 294, 296. Its duty is to dispose of the matter

"upon the record, without regard to the awards or findings theretofore made" and to fix the value. But it need not blind itself to the special advantages of the tribunals below in evaluating the evidence. A trial *de novo* with the fresh taking of evidence is not required. An independent revaluation of the property condemned is contemplated. And that requirement was met here.

II. Sec. 25 of the Act authorizes awards covering "the value of the lands sought to be condemned." The storm center of this controversy is whether water power value may be included in respondent's award.

It is argued on behalf of petitioner that even though the Hiwassee River is non-navigable throughout this part of its course, compensation for the loss of any supposed power value is no more permissible than in case of a navigable stream. It is pointed out that *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53, held that there is "no private property in the flow" of a navigable stream. *United States* v. *Appalachian Power Co.,* 311 U. S. 377, 427. And it is contended that although the Hiwassee River is non-navigable at the points in question, the flow at those places has such a direct and immediate effect upon the navigable portion of the river farther downstream as to give the United States the same plenary control over both the navigable and non-navigable portions of the river (*United States* v. *Appalachian Power Co., supra; Oklahoma* v. *Atkinson Co.,* 313 U. S. 508), thereby bringing into play the rule of the *Chandler-Dunbar* case. Cf. *United States* v. *Kelly,* 243 U. S. 316. We do not stop to consider that question. For if we assume, without deciding, that rights in the "flow" of a non-navigable stream created by local law are property for which the United States must pay compensation when it condemns the lands of the riparian owner, the water power value which respondent sought to establish cannot be allowed.

The burden of establishing the value of the lands sought to be condemned was on respondent. *Ralph* v. *Hazen,*

93 F. 2d 68, 70; *Welch* v. *Tennessee Valley Authority*, 108 F. 2d 95, 101. Respondent endeavored to carry that burden by introducing evidence that the property condemned had a fair market value of $7,500,000. As we have said, the theory was that the lands condemned, together with other property owned by respondent, could be united with several hundred other tracts owned by strangers and that a four-dam hydroelectric project could be constructed upon all those lands.[7] As we have noted, only one of the four hypothetical dams was to be located on the lands condemned. That was at the Hiwassee dam site, which, considered alone, was not contended to be profitable for power development. Although respondent owned or controlled some of the other lands necessary for the four-dam project, about half of them were in adverse hands. It was practically conceded that the acquisition of all the property necessary for the four-dam development could not, in all reasonable probability, be accomplished without resort to the power of eminent domain. It was insisted, however, that since that power had been conferred by North Carolina, the case should be viewed as if respondent owned every foot of land required for the hypothetical project. Respondent proceeded from that assumption to other assumptions: an estimated cost of $30,000,000 for the four-dam project; an annual output of 512,500,000 kwh of so-called reserve, or superprimary, or "Saluda-type" energy;[8] a production cost of electricity

---

[7] While respondent owned most of the lands necessary for the Appalachia reservoir, about half of those not yet acquired lay in the state of Tennessee, in which, so far as appears, it had no power of eminent domain. And, according to respondent's estimates of the lands necessary for the other three projects, it had yet to acquire 22% of the Powelson reservoir, 73% of the Nottely, and 96% of the Murphy.

[8] The theory was that the projected reservoirs would store water during the wet season and that the power would be sold neighboring utilities during the dry season. The name given that type of power is said to derive from the fact that Lexington Water Power Co. sold the output of its Saluda plant to Duke Power Co. on a similar basis.

of 3.75 mills per kwh; and a selling price of 6.34 mills per kwh for all the energy produced. On the basis of those assumptions an assumed net return was computed. That assumed net return was capitalized at a given rate and a portion of that sum, i. e. $7,500,000, was allocated to the lands in question. Petitioner challenged most of those assumptions. It introduced evidence that the cost of the four-dam project would be higher than respondent assumed; that the total annual fixed charges of the project would exceed those estimated; that the production of energy would be less, the cost per kwh would be greater, and the sale price per kwh would be lower than respondent estimated. The Commissioners, the District Court and the Circuit Court of Appeals found on the basis of respondent's estimates of the four-dam project that the lands had a water power value, and that their availability for power purposes constituted the chief element of their value and the basis for the highest value in the property. All agreed, however, that respondent's estimate of $7,500,-000 was too high. And as we have noted, the District Court and the Circuit Court of Appeals concluded that the fair market value of the lands for power purposes was some $976,000.

An owner of lands sought to be condemned is entitled to their "market value fairly determined." *United States v. Miller,* 317 U. S. 369, 374. That value may reflect not only the use to which the property is presently devoted but also that use to which it may be readily converted. *Boom Co.* v. *Patterson,* 98 U. S. 403; *McCandless* v. *United States,* 298 U. S. 342. In that connection the value may be determined in light of the special or higher use of the land when combined with other parcels; it need not be measured merely by the use to which the land is or can be put as a separate tract. *McGovern* v. *New York,* 229 U. S. 363. But in order for that special adaptability to be considered, there must be a reasonable probability of the lands in question being combined with other tracts

for that purpose in the reasonably near future. *Olson* v. *United States,* 292 U. S. 246, 255. In absence of such a showing, the chance of their being united for that special use is regarded "as too remote and speculative to have any legitimate effect upon the valuation." *McGovern* v. *New York, supra,* p. 372.

Respondent seeks to avoid that difficulty by reliance on the power of eminent domain granted by North Carolina. The argument is that the means of effecting a combination of lands is not important—it is whether the landowner had a reasonable chance of doing it. This Court, however, held in the *McGovern* case that in estimating that chance or probability "the power of effecting the change by eminent domain must be left out." 229 U. S. p. 372. And that view was followed in *New York* v. *Sage,* 239 U. S. 57, 61. Respondent attempts to distinguish those cases on the ground that, since the landowners in question did not have the power of eminent domain, they were merely denied recovery for a value dependent upon a combination which they could not reasonably expect to effect. But the thrust of the rule is deeper. If the owner's claim against the sovereign were increased by reason of the power of eminent domain, then the very existence of the right of condemnation would confer on the owner "a value for which he must be paid when the right is exercised." Hale, Value to the Taker in Condemnation Cases, 31 Col. Rev. 1, 13.

The fact that the owner also has a power of eminent domain does not alter the situation. See *Tacoma* v. *Nisqually Power Co.,* 57 Wash. 420, 433, 107 P. 199. The grant of the power of eminent domain is a mere revocable privilege for which a state cannot be required to make compensation. *Adirondack Ry. Co.* v. *New York,* 176 U. S. 335; *Ramapo Water Co.* v. *New York,* 236 U. S. 579; *Western Union Telegraph Co.* v. *Louisville & Nashville R. Co.,* 258 U. S. 13. A revocation of that privilege is but a recall

of a part of its sovereign power for which no price may be exacted. North Carolina follows that view. *Yadkin River Power Co.* v. *Whitney Co.*, 150 N. C. 31, 63 S. E. 188. Accordingly it seems clear that if North Carolina rather than the United States were constructing this public project and condemning the identical lands for the purpose, respondent need not be compensated for the loss of an opportunity to develop a power project through utilization of the right to condemn. In case this was North Carolina's project respondent's chances of combining these numerous tracts into one ownership for a power project would be measured without reference to the power of eminent domain. The inclusion of eminent domain would be but an indirect method of making North Carolina pay for the destruction or impairment of the privilege.[9] That the private company's privilege to use the power of eminent domain need not be reflected in the valuation if the property were taken by the state is indicated by those few cases which seem to have reached the point. See *Tacoma* v. *Nisqually Power Co., supra.* That result is the necessary import of this Court's ruling in *Sears* v. *Akron*, 246 U. S. 242. Suit was brought in that case by the trustee of the property of an Ohio corporation to enjoin the City of Akron from constructing a dam and reservoir on the Cuyahoga River. The corporation had received from the State of Ohio the right to construct and operate a power system on the river. And it was also given by the state

---

[9] We do not have here the question of a market value affected by market prices which may reflect to some extent the power to condemn. As to that situation this Court stated in *Olson* v. *United States, supra,* p. 256: "It is common knowledge that public service corporations and others having that power [eminent domain] frequently are actual or potential competitors, not only for tracts held in single ownership but also for rights of way, locations, sites and other areas requiring the union of numerous parcels held by different owners. And, to the extent that probable demand by prospective purchasers or condemnors affects market value, it is to be taken into account."

the power of eminent domain so that it might acquire the property necessary for the project. In that case the land acquisition program of the private company apparently was not as far advanced as was respondent's in the present case. But the difference in degree of development is unimportant since in each case the private project was still inchoate and had not progressed beyond the promotional phase when the public project was launched. This Court held that although the project constructed by the City of Akron might imperil or wholly defeat the company's project, there was no impairment of contract, and no taking or appropriation of the company's property. In the latter connection Mr. Justice Brandeis, speaking for the Court, stated that it was clear "that Ohio retained the power as against one of its creatures, to revoke any such right to appropriate property until it had been acted upon by acquiring the property authorized to be taken." 246 U. S. p. 250. It was accordingly held that the city was free as against the company "to appropriate any of the land or any of the water rights which might otherwise have come under the development described in its certificate of incorporation." *Id.* pp. 249–250.

This is a case of first impression. No precedent has been advanced which suggests that a *different* measure of compensation should be required where the United States rather than the state is the taker of the property for a public project. Nor has any reason been suggested why as a matter of principle or policy there should be a *different* measure of compensation in such a case. It has long been assumed that in other respects the national government was under "no greater limitation" by reason of the Fifth Amendment than were the states by virtue of the Fourteenth. *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 156. That view is implicit in condemnation cases where the amount of just compensation re-

quired by the Fifth Amendment is in issue. See, for example, *Omnia Co.* v. *United States,* 261 U. S. 502, 508–509. We do not see why the protection given to "private property" under the Fifth Amendment imposes upon the United States a duty to provide a *higher* measure of compensation for these lands than would be imposed by the Fourteenth Amendment upon the state if it were the taker.[10] Nor has any reason based on considerations of equity and fair dealing been advanced for justifying a *higher* measure of compensation in the instant case because the lands are being taken for a public project sponsored by the United States rather than by North Carolina. The warrant or authority for putting the United States at such a disadvantage is not apparent.

The right of the United States to exercise the power of eminent domain is "complete in itself" and "can neither be enlarged nor diminished by a State." *Kohl* v. *United States,* 91 U. S. 367, 374. Though the meaning of "property" as used in § 25 of the Act and in the Fifth Amendment is a federal question, it will normally obtain its content by reference to local law. Yet when we look to local law in the present case, we find no indication that for purposes of condemnation proceedings instituted by North Carolina the value of the lands in question would be increased by reason of respondent's privilege to use the power of eminent domain. So far as constitutional compulsions are concerned, it is plain, as we have noted, that that factor need not be included in case the state were the condemnor. Moreover, the result in the present case is not different if we assume with the District Court (33 F. Supp. p. 522) that respondent's "prior right" under North Carolina law "constituted a valuable right, which is destroyed by this condemnation proceeding." It does

---

[10] Cf. *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 233–241, arising under the Fourteenth Amendment.

not follow that that "prior right" was "private property" within the meaning of the Fifth Amendment which was taken by the United States.

The law of eminent domain is fashioned out of the conflict between the people's interest in public projects and the principle of indemnity to the landowner. We recently stated in *United States* v. *Miller, supra,* p. 375, that "Courts have had to adopt working rules in order to do substantial justice in eminent domain proceedings." Equity and fair dealing do not require the payment by the United States to the landowner of the amount of a valuation of his lands based on the existence of his privilege to use the power of eminent domain. It is "private property" which the Fifth Amendment declares shall not be taken for public use without just compensation. The power of eminent domain can hardly be said to fall in that category. It is not a personal privilege; it is a special authority impressed with a public character and to be utilized for a public end.[11] An award based on the value of that privilege would be an appropriation of public authority to a wholly private end. The denial of such an award to the landowner does no injustice. It is true that respondent's possession of the power of eminent domain was in part the basis of an opportunity to unite the present lands with others into a power project. But he is not being deprived of values which result from his expenditures or activities. The fruits of the exercise of that power

---

[11] See *Pollard's Lessee* v. *Hagan,* 3 How. 212, 223; *Boom Co.* v. *Patterson,* 98 U. S. 403, 406; *United States* v. *Jones,* 109 U. S. 513, 518–519; *Spencer* v. *Railroad,* 137 N. C. 107, 121–122, 49 S. E. 96; *Jeffress* v. *Greenville,* 154 N. C. 490, 493–494, 70 S. E. 919; *Wissler* v. *Yadkin River Power Co.,* 158 N. C. 465, 74 S. E. 460. In the latter case the Supreme Court of North Carolina stated (pp. 466–467): "This power of eminent domain is conferred upon corporations affected with public use, not so much for the benefit of the corporations themselves, but for the use and benefit of the people at large."

of eminent domain are not being appropriated. And there is no basis for raising an estoppel against the United States as there was thought to be in *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312. See *Omnia Co.* v. *United States, supra,* pp. 513–514. The landowner is, to be sure, deprived of a preferential advantage, which was an incidental attribute of the public authority with which the state endowed him. But that advantage had no higher dignity than a promise of a gratuity. It had not been availed of to develop an existing and going enterprise which the United States appropriated. Respondent's project was only a speculative venture—a promotional scheme wholly *in futuro.* Thus we conclude that respondent had no interest under his unexercised power of eminent domain which rises to the estate of "private property" within the meaning of the Fifth Amendment. Cf. *Rundle* v. *Delaware & R. Canal Co.,* 14 How. 80, 94.

This public project, to be sure, has frustrated respondent's plan for the exploitation of its power of eminent domain. We may assume that that privilege was a thing of value and that this frustration of the plan means a loss to respondent. But our denial of compensation for that loss does not make this an exceptional case in the law of eminent domain. There are numerous business losses which result from condemnation of properties but which are not compensable under the Fifth Amendment. The point is well illustrated by two other lines of cases in this field. It is a well settled rule that while it is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken (*United States* v. *Miller, supra; United States* v. *Chandler-Dunbar Co., supra,* p. 81; *Boston Chamber of Commerce* v. *Boston,* 217 U. S. 189, 195), not all losses suffered by the owner are compensable under the Fifth Amendment. In absence of a

282

statutory mandate (*United States v. Miller, supra,* p. 376) the sovereign must pay only for what it takes, not for opportunities which the owner may lose. See Orgel, Valuation Under Eminent Domain (1936) § 71, § 73. On the one hand are such cases as *Monongahela Navigation Co. v. United States,*[12] *supra,* where it was held that the United States had appropriated a going enterprise to its own ends and must make compensation accordingly. But it is well settled in this Court [13] that, "Frustration and appropriation are essentially different things." *Omnia Co. v. United States, supra,* p. 513. Thus in *Mitchell v. United States,* 267 U. S. 341, the owner was denied compensation for the destruction of his business which resulted from the taking of his land for a public project even though the business could not be reëstablished elsewhere. This Court, after noting that "settled rules of law" precluded

[12] And see *Long Island Water Supply Co. v. Brooklyn,* 166 U. S. 685; *Cincinnati v. Louisville & Nashville R. Co.,* 223 U. S. 390; *Pennsylvania Hospital v. Philadelphia,* 245 U. S. 20; *Brooks-Scanlon Corp. v. United States,* 265 U. S. 106; *De Laval Steam Turbine Co. v. United States,* 284 U. S. 61. In the *Monongahela* case the United States condemned a lock and dam constructed at the invitation of the United States and operated by the owner under a franchise from Pennsylvania. This Court held that the special facts of the case required that the franchise or going concern value of the enterprise be included in the compensation payable to the owner. It was said in the first place that the franchise granted to the company by Pennsylvania was a valuable property right, since it was a contract under the rule of *Dartmouth College v. Woodward,* 4 Wheat. 518, and protected against impairment by the state. Secondly, the Court noted that the United States did more than destroy the business; it appropriated the enterprise for public purposes. Moreover, as was stated in *Omnia Co. v. United States, supra,* pp. 513–514, the *Monongahela* case "rested primarily upon the doctrine of estoppel, as this Court has in several cases since pointed out."

[13] See *Bothwell v. United States,* 254 U. S. 231; *Joslin Co. v. Providence,* 262 U. S. 668, 675; *Atwater & Co. v. United States,* 275 U. S. 188; *United States v. Carver,* 278 U. S. 294; *Mullen Benevolent Corp. v. United States,* 290 U. S. 89.

a consideration of "consequential damages" for losses of a business or its destruction, stated: "No recovery therefor can be had now as for a taking of the business. There is no finding as a fact that the Government took the business, or that what it did was intended as a taking. If the business was destroyed, the destruction was an unintended incident of the taking of land." 267 U. S. p. 345. That which is not "private property" within the meaning of the Fifth Amendment likewise may be a thing of value which is destroyed or impaired by the taking of lands by the United States. But like the business destroyed but not "taken" in the *Mitchell* case it need not be reflected in the award due the landowner unless Congress so provides.

It is no answer to say that the evidence as to the profits from respondent's hypothetical four-dam project was introduced not as the basis of an award for loss of profits or business but only as a basis for estimating the true water power value of the property. The computation of those profits assumes the very existence of the projected enterprise which the power of eminent domain alone could make possible and which these condemnations frustrated. We repeat that an allowance of any such value would entail a payment for the loss of a business prospect based on an unexercised power of eminent domain. As we have said, no reason based on precedent or principle appears why respondent's privilege to use the power of eminent domain should be treated as "private property" within the meaning of the Fifth Amendment so as to give rise to a private claim against the public treasury. Nor is there any indication that Congress adopted in this regard a more liberalized standard of compensation than would be provided under the Fifth Amendment.

It is suggested that this result would mean that in condemnation proceedings the United States need not pay the value of the property at the time of the taking if the

state where the property is located might destroy or diminish that value through an appropriate exercise of its police power. It is manifest that such is not the case. A state may of course destroy or diminish values by an assertion of its police power without the necessity of making compensation for the loss. *Hamilton* v. *Kentucky Distilleries Co., supra; Block* v. *Hirsch,* 256 U. S. 135, 156. While such a change will not be presumed (*United States* v. *River Rouge Co.,* 269 U. S. 411), the possibility or probability of such action, so far as it affects present values, is a proper subject for consideration in valuing property for purposes of a condemnation award. See *Reichelderfer* v. *Quinn,* 287 U. S. 315, 323. We do not disturb those general principles. The United States no more than a state can be excused from paying just compensation measured by the value of the property at the time of the taking merely because it could destroy that value by appropriate legislation or regulation. But we have here a unique situation. The power of eminent domain which respondent seeks to have reflected in the valuation is largely unexercised and need not be reflected in the measure of compensation if the state which conferred the privilege were the taker of the lands. If these numerous tracts had already been united by respondent through the power of eminent domain into a power project, distinct problems would be posed as *Sears* v. *Akron, supra,* indicates. Then the United States would be acquiring a business, not simply frustrating a promotional scheme. We merely hold that the United States, in absence of a specific statutory requirement, need not make compensation for the loss of a business opportunity based on the unexercised privilege to use the power of eminent domain where the state need not do so were it the sponsor of the public project and the taker of the lands. The constitutional obligation of the United States to make compensation does not extend so far.

It is true that this result will reduce an award which the Circuit Court of Appeals noted was approximately equal to respondent's total investment in the lands acquired for its project, plus 3% interest. But the Fifth Amendment allows the owner only the fair market value of his property; it does not guarantee him a return of his investment. *Minnesota Rate Cases,* 230 U. S. 352, 454; *Brooks-Scanlon Corp.* v. *United States,* 265 U. S. 106, 123; *Olson* v. *United States, supra,* p. 255.

The result is that respondent's privilege to use the power of eminent domain may not be considered in determining whether there is a reasonable probability of the lands in question being combined with other tracts into a power project in the reasonably near future. If the power of eminent domain be left out of account, the chances of making the combination appear to be too remote and slim "to have any legitimate effect upon the valuation." *McGovern* v. *New York, supra,* p. 372. Respondent therefore has not established the basis for proof of the water power value which was asserted.

We hold only that profits, attributable to the enterprise which respondent hoped to launch, are inadmissible as evidence of the value of the lands which were taken. Respondent is, of course, entitled to the market value of the property fairly determined. And that value should be found in accordance with the established rules (*United States* v. *Miller, supra*)—uninfluenced, so far as practicable, by the circumstance that he whose lands are condemned has the power of eminent domain. We do not reach the question much discussed at the bar and in the briefs whether evidence of the earnings of respondent's hypothetical four-dam project should have been excluded for the further reason that it was too speculative.[14]

---

[14] See *Sharp* v. *United States,* 191 U. S. 341, 348–350; *San Diego Land & Town Co.* v. *Neale,* 88 Cal. 50, 58–63, 25 P. 977; *Matter of City of New York,* 118 App. Div. 272, 275, 103 N. Y. S. 441; *New*

The judgment is reversed and the cause is remanded to the Circuit Court of Appeals for proceedings in conformity with this opinion.

*Reversed.*

Mr. Justice Jackson, dissenting:

The Chief Justice, Mr. Justice Roberts, Mr. Justice Frankfurter and I understand the Court to hold that property physically adaptable to power purposes, taken by the Federal Government for power purposes among others, is to be valued as worthless for power purposes as matter of law because its projected development might be defeated if the State should revoke the power of eminent domain admittedly possessed by the owner at the time of the taking. We think it denies proper effect to state law and policy in effect at the time of taking.

Unless this decision overrules the law as stated by Mr. Justice Brandeis for a unanimous Court, flowing streams are natural resources owned and governed by the States, and the rights of their grantees and of riparian owners are settled by the local law which is conclusive on us. *Port of Seattle* v. *Oregon & Washington R. Co.*, 255 U. S. 56; *St. Anthony Falls Water Power Co.* v. *St. Paul Water Comm'rs*, 168 U. S. 349; *Shively* v. *Bowlby*, 152 U. S. 1; cf. *United States* v. *Oregon*, 295 U. S. 1, 6–7. The States have assumed this to be their right and have written into their laws and constitutions various systems of control and development deemed suitable to their respective climates, industries or economies.[1]

*York Central R. Co.* v. *Maloney*, 234 N. Y. 208, 218, 137 N. E. 305; *Sparkill Realty Corp.* v. *New York*, 268 N. Y. 192, 197 N. E. 192; *Burt* v. *Wigglesworth*, 117 Mass. 302, 306; *Hamilton* v. *Pittsburg, B. & L. E. R. Co.*, 190 Pa. St. 51, 57, 42 A. 369. Cf. *United Gas Co.* v. *Railroad Commission*, 278 U. S. 300, 317–318.

[1] Typical provisions from state constitutions are:

California, Article XIV, § 3: ". . . Riparian rights in a stream or water course attach to, but to no more than so much of the flow

The Hiwassee River, therefore, is a resource of the State of North Carolina. To obtain the advantage of its latent energy that State by special act of its Legislature created

thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, or of depriving any appropriator of water to which he is lawfully entitled. . . ."

Colorado, Article XVI, § 6: "The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose; but when the waters of any natural stream are not sufficient for the service of all those desiring the use of the same, those using the water for domestic purposes shall have the preference over those claiming for any other purpose, and those using the water for agricultural purposes shall have preference over those using the same for manufacturing purposes."

North Dakota, Article XVII, § 210: "All flowing streams and natural water courses shall forever remain the property of the state for mining, irrigating and manufacturing purposes."

Rhode Island, Article I, § 17: "The people shall continue to enjoy and freely exercise all the rights of fishery, and the privileges of the shore, to which they have been heretofore entitled under the charter and usages of this state. But no new right is intended to be granted, nor any existing right impaired, by this declaration."

Utah, Article XVII, § 1: "All existing rights to the use of any of the waters in this State for any useful or beneficial purpose, are hereby recognized and confirmed."

Washington, Article XVII, § 1: "The State of Washington asserts its ownership to the beds and shores of all navigable waters in the state up to and including the line of ordinary high tide in waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes: Provided, that this section shall not be construed so as to debar any person from asserting his claim to vested rights in the courts of the state."

Article XXI, § 1: "The use of the waters of this state for irrigation, mining, and manufacturing purposes shall be deemed a public use."

Wisconsin, Article XXI, § 1: "The state shall have concurrent juris-

a corporation and gave it extensive powers including the right of eminent domain.[2] The corporation acquired, partly by purchase and partly by condemnation, the dam sites, bed of the stream, riparian lands and key properties necessary to the development. The right to acquire by condemnation any additional lands needed was never repealed or withdrawn but on the other hand was confirmed by the state courts in a series of litigations.[3] There is no finding or evidence that forfeiture, repeal or impairment of these rights has been considered or threatened by the State or is even remotely probable, even if legally possible.

Under its paramount powers over navigation the Federal Government has elected to take this resource out of the control of the State and away from the grantee corporation which is subject to State taxing and regulatory power. This it may do, but only upon making just compensation. But the Court holds that compensation must be computed as if the State had refused to grant what it has granted or had withdrawn what it has given no indication of withdrawing. By thus cancelling for the purpose

diction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor."

See also *Kaukauna Water Power Co.* v. *Green Bay Canal Co.*, 142 U. S. 254, 272; cf. *International Paper Co.* v. *United States*, 282 U. S. 399.

[2] Private Laws of North Carolina, 1909, c. 76, p 185.

[3] *Carolina-Tennessee Power Co.* v. *Hiawassee River Power Co.*, 171 N. C. 248, 88 S. E. 349 (1916), 175 N. C. 668, 96 S. E. 99 (1918), 186 N. C. 179, 119 S. E. 213 (1923), 188 N. C. 128, 123 S. E. 312 (1924); *Hiawassee River Power Co.* v. *Carolina-Tennessee Power Co.*, 252 U. S. 341 (1920), 267 U. S. 586 (1925).

the power of eminent domain, it holds as a matter of law that the project was not feasible to execute and that the lands assembled for power purposes, admittedly physically adaptable to the use and taken by the Government for that purpose, have no power utilization value. This seems to us not easily reconciled with the respect due to local law in a matter of the kind.

Determination of the value of property, particularly as affected by a prospective use, always involves some element of prophecy and some estimation of probabilities. No court that we know of has ever proposed, and we do not propose, to value the power of eminent domain either separately or as an ingredient of property taken. Its existence should be considered only for the purpose of determining the most advantageous probable usefulness of the property as it affects its value. The legal principles governing the solution of the fact questions are laid down in *Olson* v. *United States,* 292 U. S. 246. Of course any uncertainty or limitation as to the right to condemn property or evidence of probable impairment, forfeiture, or withdrawal of it would be weighed with other evidence in arriving at a judgment as to the feasibility of the project and value of the property. This Court has said that a possibility of exercise by a governing body of its power to make changes affecting values is a proper subject for consideration in fixing values. *Reichelderfer* v. *Quinn,* 287 U. S. 315, 323. But never until now has it held that the law requires present values to be determined as if legally possible, but factually improbable, changes have already taken place.

Few properties are so immune from the effects of governmental authority that some action may not be envisioned which would devalue them. One of the items taken by the Federal Government in this case from respondent and out of control of the State was a going concern, an electric generating plant and distributing system. Since both parties accepted the award made for

this plant it is no longer an issue, but is illustrative of the legal problem raised by the Court's opinion. Doubtless the State Government had power to make many innovations detrimental to its success and to impose burdens that would detract from its value and perhaps had reserved powers to annul its corporate or special franchises. But we would not suppose that such hypothetical destruction of property values could be invoked to minimize compensation payable on a taking any more than hypothetical accretions to its rights through state action, possible but never accomplished, could increase such compensation. In many cases the beneficial use and hence the value of abutting property may be decreased if public authority closes or obstructs a public street or canal, or changes the grade of a street, or the location of a county seat.[4]

---

[4] See examples and citation of cases in *Reichelderfer* v. *Quinn, supra,* at 319.

The validity of the principle adopted by the majority opinion may be tested against hypothetical cases such as the following:

1. *O* owns a dock projecting into a navigable stream in State *S*. The Federal Government may destroy it or require its removal without payment of compensation (*United States* v. *Chicago, M., St. P. & P. R. Co.*, 312 U. S. 592), but it does not appear likely that it will do so, and the dock is a commercially valuable property. *S* acquires the dock by condemnation, and seeks to avoid payment by relying upon the power of the Federal Government to destroy its value.

2. *O* owns a distillery in State *S*. *S* acquires it by condemnation, and resists payment by asserting the existence of the Federal Government's power to enact a prohibition law and thereby destroy or diminish the value of the distillery without the payment of compensation (*Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146).

3. *O* owns an option upon land owned by State *S*. The option is revocable at the will of *S*, but revocation seems unlikely, and the option has commercial value. The Federal Government acquires it by condemnation, but resists payment by relying upon *S's* power of revocation.

These cases can be further complicated by supposing that the condemnation is not by the sovereign itself, but by a private corporation vested by it with the power of eminent domain.

But in all such cases the compensation payable should be the value of the property at the time of taking, allowing for any influence that these contingencies might exert, which would depend upon their probability.

No previous decision of this Court supports or authorizes disregard of a presently existing state right of eminent domain in a federal taking of property. In *McGovern* v. *New York,* 229 U. S. 363, and *New York* v. *Sage,* 239 U. S. 57, the condemnation was by an agency of the State and the condemnees did not have and showed no probability of obtaining such power from the State.

Even less relevant to the question now before us is *Sears* v. *Akron,* 246 U. S. 242. It was not a condemnation case at all but a suit in equity to enjoin the City from construction of a dam and reservoir and diversion of river water. The City did not propose to take any property of the company through which plaintiff as a mortgage creditor derived any rights he asserted. In fact the company did not own any property included in the project, although shortly before commencement of the suit, but after the City's development was practically completed, it acquired two small parcels some distance below the City's dam. But the company's charter gave it a right of eminent domain and, although it had taken no step to do so, it claimed the right to expropriate the same property the City was taking. It sought to enjoin the City upon the ground that its unexercised right to take this property was an indefeasible property right which was being defeated and rendered valueless because the City was ahead of it in preëmpting properties which the company might want to acquire under its power. The State of Ohio had retained power to "revoke any such right to appropriate property until it had been acted upon by acquiring the property authorized to be taken." *Id.* at 250. The State of course had revoked the power to the extent that it had authorized the City, its own instrumentality, to take the property. But Jus-

tice Brandeis pointed out that "Nor are we called upon to determine to what extent the commencement of the acquisition of needed property in preparation for the power development, or even actual commencement of construction, would have vested in the company the right to complete the development." *Ibid.* The decision is now relied upon to establish the point it expressly reserved. Moreover, the Ohio company had tried to use its power of condemnation, and Ohio courts had held its charter did not authorize it to take lands essential to its project. *Cuyahoga River Power Co.* v. *Northern Realty Co.,* 244 U. S. 300. In the case now before us the North Carolina courts had held the power given by that State to this company was complete and prior to every other at the very location involved here.[5]

These cases do not decide what would have been respondent's rights if North Carolina, rather than the United States, had instituted the present condemnation proceedings, thereby expressing her unwillingness to have the respondent carry the project through to completion. They are wholly inapposite to the question we are called upon to decide, which is whether North Carolina's expressed and undoubted willingness that the respondent should do so, and to that end should exercise her sovereign power of eminent domain, may be considered along with all other facts bearing upon the question of the prospects of completion.

The Government and the Court have taken a contrary position to the one now announced when the shoe was on the other foot. In *United States* v. *River Rouge Co.,* 269 U. S. 411, the Government sought to deduct from the value of property condemned the benefits conferred by the improvement upon the severed property. The owner denied that these benefits should be considered because his enjoyment of them would be terminable by the Gov-

---

[5] See footnote 3, *supra.*

ernment at any time. The Court sustained credit for the benefits, pointing out that "there was nothing in the evidence indicating any probability that the Government would at any time abrogate or curtail this right in any respect." *Id.* at 420.

We think the same rule should apply against as for the Government, and that the property in question was entitled to the benefits at the time being extended by State authority in the absence of evidence of probability that they would be abrogated or curtailed. We do not think that because the power of eminent domain may have been revocable by the State it follows as matter of law that it must be treated as nonexistent, and we dissent from a reversal based on such grounds.