UNITED STATES of America, Plaintiff,

v.

**15.00 ACRES OF LAND, MORE OR LESS, IN the COUNTY OF MISSISSIPPI, STATE OF ARKANSAS, and F. E. Scott, et al., and Unknown Owners, Defendants.**

No. J–72–C–39.

United States District Court,
E. D. Arkansas,
Jonesboro Division.

March 23, 1979.

Walter G. Riddick, Asst. U. S. Atty., Little Rock, Ark., for plaintiff.

Graham Partlow, Everett E. Harber, Blytheville, Ark., for defendants.

## MEMORANDUM OPINION

ROY, District Judge.

This action involves the government's condemnation of a fifteen acre rectangular tract of land located in Mississippi County, Arkansas. The land in question is situated in the western portion of the Big Lake National Wildlife Refuge [1] and is complete-

1. The Big Lake area may be roughly divided into two halves. The eastern half or portion is owned by the Arkansas State Game and Fish Commission. The Commission maintains the major portion of the eastern half as a public shooting range, an area where, for a modest fee, a person is allowed to hunt ducks. The Commission apparently clears areas of timber where necessary and plants some of the acreage in various grain crops to facilitate duck hunting. In contrast, the western portion of the Big Lake area, with the exception of the fifteen acre tract in issue, is owned by the United States. The western portion, as its name implies, is maintained as a wildlife refuge. Duck hunting on the refuge is prohibited although the defendants were allowed to duck hunt on the fifteen acre tract until the government condemned it. As in the State owned eastern portion of the Big Lake area, food crops are planted in the wildlife refuge in order to achieve optimum conditions in waterfowl habitat. The evidence produced at trial clearly demonstrated a substantial increase in recent years in the number of duck hunters in the area and a corresponding rise in competition for available natural resources. Much of the increase in demand for additional duck hunting

ly surrounded by properties which have been previously taken by the government as part of its wildlife refuge project. The events and circumstances giving rise to the present controversy are summarized below.

On August 16, 1972 the government filed a notice of condemnation. In due course summons were issued and served upon the defendants. The government also tendered on the same date the amount of $3,750.00, its estimated amount of compensation for the property condemned. The defendants subsequently appeared by counsel and contested the government's valuation of the tract of land.[2] Thus, the sole issue presented by this case is whether the defendants have been justly compensated for their respective interests in the subject tract. Before considering the valuation issue, however, it is helpful to consider the physical characteristics of the property and the interests of the respective defendants.

The fifteen acre rectangular tract is located about one quarter of a mile from a ditch on the western boundary of the Big Lake National Wildlife Refuge. There are no roads or hiways providing direct access to the property. Most of the year the property is covered by water of varying depths and even in the drier parts of the year the land has water on it since a slough meanders through the property. Access to the tract[3] is attained either by walking, wading or by boat, depending on current water levels. Parts of the tract are clear and other parts are covered by various kinds of trees and other vegetation. The tract itself has little, if any, natural food for ducks although, as previously indicated, food crops for ducks are planted on certain areas of the wildlife refuge. The only structure on the tract at the time of taking was a single "duck blind".[4]

John Charles Bright and Hayes T. Sullivan acquired an undivided three-fourths interest in the fifteen acre tract by a quitclaim deed from Mr. and Mrs. F. E. Scott. The deed was recorded on March 17, 1972, approximately five months prior to the date of taking, in Record Book 260, page 400 in the office of the Circuit Clerk of Mississippi County, Arkansas. The amount of consideration paid by Mr. Bright and Mr. Sullivan for their undivided three-fourths interest in the property was $3,750.[5] Bill Cude ac-

lands was attributed to the influx of additional duck hunters from nearby Blytheville Air Force Base.

2. This action was one of a large number of civil cases which were reassigned to this court on September 1, 1978. This case was tried to the court sitting without a jury on December 14, 1978.

3. Testimony produced at trial indicated that the government allowed the defendants and their guests access to and from the fifteen acre tract by means of a "trail" which had been marked for that purpose.

4. A "duck blind" is a relatively small structure erected above the water to shelter hunters from the elements while awaiting the arrival of their quarry. The blind, which is usually built of wood or tin, can be as elaborate or simple as the hunter desires. The testimony offered by the defendants at trial indicated that the cost of constructing a duck blind in 1972 was about $200. A single duck blind can accommodate between four to six hunters.

5. The government contested the amount of consideration paid by Mr. Sullivan and Mr. Bright. The government contended that only $2800 was actually paid for their undivided three-fourths interest in the tract. The actual amount of consideration paid by the owners is relevant only insofar as their purchase of the property is utilized as a comparable sale. In any event there is sufficient evidence to warrant a finding that $3750 was paid by the condemnees for their undivided three-fourths interest in the tract. The government also contested Mr. Scott's contention that he had reserved the lifetime duck hunting rights in the land. As has been previously noted, Mr. Scott and his wife conveyed their undivided three-fourths interest in the fifteen acre tract by quitclaim deed to Mr. Sullivan and Mr. Bright. That deed conveys all right, title and interest that Mr. and Mrs. Scott may have had in the property to their successors in interest, Mr. Sullivan and Mr. Bright. Inasmuch as there was no express reservation of the interest claimed by Mr. Scott in the deed, the court must conclude that Mr. Scott possessed no enforceable right with respect to duck hunting rights. Assuming, *arguendo,* that duck hunting rights are capable of severance in a conveyance, there must still be some evidence of the reservation in order to defeat what otherwise appears to be a complete transfer of all rights in the estate.

quired an undivided one-fourth interest in the tract by warranty deed from Mr. and Mrs. Leroy Carter. The deed evidencing the conveyance to Mr. Cude was dated November 15, 1971, but was not recorded in the Circuit Clerk's office until March 8, 1972. Mr. Cude's deed appears in Record Book 260 at page 306. Mr. Cude testified at trial that he paid $937 for his undivided one-fourth interest in the fifteen acre tract.

Every witness that testified for the defendants acknowledged that the highest and best use of the tract was for duck hunting. Mr. Lingman, the government's appraiser, while reluctant to assign a single best use for the land admitted that the tract was locally acknowledged as a good duck hunting area. Mr. Lingman, a senior real estate appraiser who now works as a review appraiser, testified that the highest and best use of the fifteen acre tract was for "duck hunting and timber production." Mr. Clyde A. Stewart, an employee of the United States Fish and Wildlife Service, contradicted Mr. Lingman's testimony, however, at least to the extent of Mr. Lingman's conclusion that timber production was one of the best uses of the fifteen acre tract. Mr. Stewart conducted a 100% cruise[6] of the timber on the tract and determined a market value for the timber based on his inventory and investigation of potential sales of the timber. Mr. Stewart testified, in comparative terms, that the amount of timber on the tract was small and that the logging conditions were adverse. Furthermore, while the court is obliged to consider all uses of the property, including prospective or potential uses, in establishing value, it appears from the court's assessment of the testimony that timber production and duck hunting are mutually exclusive uses of the fifteen acre tract. Testimony of witnesses who were experienced duck hunters established that the existence of trees is a necessary prerequisite to a good duck hunting area. Thus, if the timber on the tract was severed, as would be contemplated by any economically feasible timber production operation, the value of the tract as a duck hunting area would be wholly vitiated. In view of this factor and all the other evidence produced at trial the court must conclude that the highest and best use of the fifteen acre tract was for duck hunting.

The central issue in this case is determining what constitutes the fair market value of the property in question. While none of the parties have disputed this ultimate objective their methods of reaching the desired end had differed drastically. It is thus the method of the respective parties in determining the value of the property which provides the real controversy in the present suit. The essential controversy is clearly manifested by the extreme differences in value offered by the condemnor and condemnee. For example, the defendants have earnestly contended that the tract of land has a fair market value of between $100,000 and $150,000 if the direct capitalization of net income approach is utilized to determine the value of the property. The government, on the other hand, has contended with equal vigor that the condemnees' method of valuation is inappropriate and that the fair market value of the fifteen acre tract is only $4,325 if value is determined through comparable sales. It thus appears that the fair market value of the tract cannot be established until the appropriate method of computing the property's value has been resolved. We proceed to the resolution of the latter issue.

The objective in any condemnation proceeding is, of course, to fairly compensate, to indemnify, the owner for the

---

6. A "100% cruise of the timber" means going through the tract and physically counting each and every tree capable of being utilized for timber. Mr. Stewart testified that the fifteen acre tract had 273 cypress trees, 374 ash trees, 37 willow trees, 22 hackberry trees and 13 oak trees. He also testified that there were a small number of other kinds of trees. Mr. Stewart estimated that the trees capable of being used as lumber represented approximately 106,691 board feet. He further testified that a fair price for the timber would be between $25–$30 per 1,000 board feet or $3,210 for all the timber. This latter figure assumes the maximum price per 1,000 bd. ft. or $30.

loss sustained as a result of the government's exercise of its powers of eminent domain. The usual method of attaining this goal is by awarding the owner or owners the fair market value of the property, the basic measure of compensation in a condemnation case. Alternative methods of valuation, such as the direct capitalization of net income, are appropriate only when fair market value cannot be determined or would provide inadequate compensation. *United States v. 3,727.91 Acres of Land, Etc.,* 563 F.2d 357, 360–361 (8th Cir. 1977). After reviewing the evidence in the present case we must conclude that direct capitalization of net income is an inappropriate basis for determining the fair market value of the fifteen acre tract.

In the present case the defendants have arrived at the fair market value of the fifteen acre tract by capitalizing anticipated profits from the prospective rental of blinds to persons desiring to hunt ducks on the tract. The evidence admitted without objection at trial clearly established that the defendants had not yet built additional blinds and had not charged any person for duck hunting on the tract prior to the date of taking.[7] It thus appears that the defendants' valuation of the tract is based wholly on the loss of future profits, profits which, although completely unrealized at the time of taking, were to be derived through the utilization of the land for an anticipated business opportunity. Loss of prospective or anticipated business opportunities are not compensable in a condemnation case where the realization of the oppor-

tunity has not even begun as of the date of taking. As the United States Supreme Court observed in *United States ex rel. Tennessee Valley Authority v. Powelson,* 319 U.S. 266, 281, 63 S.Ct. 1047, 1056, 87 L.Ed. 1390 (1943), "It is a well settled rule that while it is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken, not all losses suffered by the owner are compensable under the Fifth Amendment. In absence of a statutory mandate [citations omitted] the sovereign must pay only for what it takes, not for opportunities which the owner may lose." Compare, *Monongahela Navigation Co. v. United States,* 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463 (1893). Nor can the condemnees recover the value of their land as measured by the future loss of profits. This rule and its underlying justifications were cogently stated by the Court in the case of *United States v. General Motors Corporation,* 323 U.S. 373, 379–380, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945):

"The sovereign ordinarily takes the fee. The rule in such a case is that compensation for that interest does not include future loss of profits, the expense of moving removable fixtures and personal property from the premises, the loss of goodwill which inheres in the location of the land, or other like consequential losses which would ensue the sale of the property to someone other than the sovereign. No doubt all these elements would be considered by an owner in determining whether, and at what price, to sell. No

---

7. Witnesses for the defendants testified that the fifteen acre tract could accommodate 5 or 6 duck blinds. There was only one blind on the property at the time of taking. The cost of constructing a single duck blind in 1972 was approximately $200. The evidence presented on behalf of the defendants showed that the duck hunting season was approximately 45 days in Arkansas in 1972. The defendants' capitalization of income formula was predicated on the profits to be derived by selling duck hunting rights on a daily basis or by renting each of the proposed duck blinds for an annual fee. Several of the defendants' witnesses testified that each blind could be rented at a fee of $1,000 per year. If this rental basis was utilized and all blinds were rented as anticipated, a gross income of between $5,000 and $6,000 could be realized from the leasing of the proposed duck blinds on the fifteen acre tract. As an alternative method for capitalizing income from the leasing of duck hunting rights, the defendants' witnesses testified that in 1972 it was customary for established duck clubs to charge persons desiring to hunt on club property a fee of $10 per day. Thus, if 25 hunters could be accommodated each day of the hunting season, the fifteen acre tract could produce a potential gross income of 25 × $10 per day × 45 days of hunting season for a total of approximately $11,250 for the 1972 duck hunting season. This latter amount, of course, assumes a constant demand by hunters at maximum levels.

doubt, therefore, if the owner is to be made whole for the loss consequent on the sovereign's seizure of his property, these elements should be properly considered. But the courts have generally held that they are not to be reckoned as part of the compensation for the fee taken by the Government. We are not to be taken as departing from the rule they have laid down, which we think sound. Even where state constitutions command that compensation be made for property "taken or damaged" for public use, as many do, it has generally been held that that which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage."

We must therefore conclude that the defendants in the instant case cannot recover, as the fair value of the land in question, the amount of future profits lost through the foreclosure of an anticipated or prospective business opportunity, *United States ex rel. Tennessee Valley Authority v. Powelson, supra,* 319 U.S. at 285, 63 S.Ct. 1047, especially where, as in the present case, those profits are purely speculative and conjectural. *Mills v. United States,* 363 F.2d 78, 81 (8th Cir. 1966); *United States v. 620.00 Acres of Land, Etc.,* 101 F.Supp. 686 (W.D. Ark.1952); *United States v. 116.00 Acres of Land, Etc.,* 227 F.Supp. 100, 105 (W.D.Ark. 1964).[8] Additionally, direct capitalization of net income is an appropriate method of valuation only when the landowner can establish actual income, application of the capitalization approach is thus necessarily limited to those situations where eminent domain proceedings impinge an established, on-going business' opportunity for *continued,* as opposed to *prospective* profit. There can be no capitalization of income unless the fact of income is itself first established. See *United States v. Corbin,* 423 F.2d 821, 824 (10th Cir. 1970). Any other rule would permit a valuation, speculative *ab initio,* to be seriously compounded.

After considering all of the evidence submitted by the respective parties, this court is persuaded that the evidence of comparable sales offered by the government provides the most accurate appraisal of the fair market value of the fifteen acre tract.[9] Mr. Richard Lingman, a senior real estate appraiser with the United States Fish and Wildlife Service, testified as an expert witness for the government at the trial of this cause. Mr. Lingman identified four previous land transactions which, in his opinion, were sufficiently similar to be considered as comparable sales for purposes of determining the fair market value of the tract of land in question. The first sale, which was utilized to determine time appreciation, occurred in February of 1965. The sale involved the purchase of 160 acres in the Big Lake fly way in Mississippi County, Arkansas. The second sale occurred on January 25, 1971. This sale involved the purchase of an 80 acre parcel of land in Dunklin County, Missouri. The 80 acre parcel sold for a

---

**8.** In *United States v. Petty Motor Co.,* 327 U.S. 372, 377–378, 66 S.Ct. 596, 599, 90 L.Ed. 729 (1946), the Supreme Court made the following comment: " * * * it has come to be recognized that just compensation is the value of the interest taken. This is not the value to the owner for his particular purposes or to the condemnor for some special use but a so-called 'market value'. It is recognized that an owner often receives less than the value of the property to him but experience has shown that the rule is reasonably satisfactory. Since 'market value' does not fluctuate with the needs of [the] condemnor or condemnee but with general demand for the property, evidence of loss of profits, damage to good will, the expense of relocation and other such consequential losses are refused in federal condemnation proceedings."

See also *Bothwell v. United States,* 254 U.S. 231, 41 S.Ct. 74, 65 L.Ed. 238 (1920); *Joslin Mfg. Co. v. City of Providence,* 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923); *Omnia Commercial Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923).

**9.** The court is not unmindful of the special significance of this land to the defendants, their families, friends and associates. And, while the court is sympathetic to the unique problems posed by the increasing demand for the limited natural resources involved in this case, the court must resolve the issues herein on the same basis as a jury, without regard to sympathy or prejudice or like or dislike of any party to this suit.

price of $50 per acre. The next sale consisted of the purchase of F. E. Scott's undivided three-fourths interest in the fifteen acre tract involved in this suit by defendants Sullivan and Bright. This sale occurred on March 17, 1972, approximately five months before the date of taking. The purchase of Mr. Scott's partial interest indicates that defendants Sullivan and Bright paid a price of $333.33 per acre. The fourth sale consisted of defendant Cude's purchase of an undivided one-fourth interest in the fifteen acre tract from Mr. and Mrs. Leroy Carter. Defendant Cude purchased the undivided one-fourth interest on November 11, 1971 and paid a total price of $937. The total price paid by defendant Cude indicates a price of $250 per acre for an undivided one-fourth interest in the fifteen acre tract. The last comparable sale offered into evidence by the government consisted of the purchase of a 686 acre tract of land in Dunklin County, Missouri. This transaction took place on December 29, 1972, approximately four months after the date the fifteen acre tract was taken. A particular point of interest in this last transaction was the fact that the Dunklin County land had six duck blinds located on the property. Mr. Lingman testified that each of the blinds were leased for a fee of $320 per year. The purchase price of the 686 acre tract in Dunklin County suggested that a price of $50 per acre had been paid for the land. Mr. Lingman acknowledged that the physical characteristics of the 686 acre tract were different from the fifteen acre tract inasmuch as the 686 acre tract had burned over timber on a portion of it. Based on these sales, the closeness of these sales in time to the taking of the fifteen acre tract, the use of lands having similar characteristics and the circumstances of the sales mentioned above, Mr. Lingman testified that in his expert opinion the fifteen acre tract had a fair market value of $288.33 per acre or a total fair market value of $4,325.

 The defendants have made much of the fact that the government's expert witness did not assign a specific value to the land as an area for duck hunting. While the defendants were entitled to establish the adaptability of the fifteen acres for a particular use, that use alone is not the only relevant consideration in determining the fair market value of the condemned property. In determining the fair market value of a condemned tract of land all factors should be considered which would influence a person of ordinary prudence desiring to purchase the property involved. See *United States v. 147.47 Acres of Land, Etc.*, 352 F.Supp. 1055 (M.D.Penn.1972). Furthermore, while the value of the fifteen acre tract for duck hunting purposes is conceded, it does not follow that the defendants are to be compensated on the basis of that particular value alone. Particularly where, as in the present case, the value of the property for duck hunting has been clearly enhanced by the location of the property in the midst of the Big Lake National Wildlife Refuge, an area where, although substantial efforts have been made to maintain an environment attractive to migratory waterfowl, duck hunting is specifically forbidden. It thus appears the value of the tract for duck hunting stems largely from the quality of the habitat of surrounding and adjacent properties and from the absence of competition from other hunters. It further appears, and the court so finds, that the fifteen acre tract in question was probably within the scope of the Big Lake National Wildlife Refuge Project from the project's inception. This latter conclusion is buttressed by the fact that all lands within a significant radius of the tract had been previously condemned by the government as part of the wildlife refuge project. Under these circumstances the landowners are not entitled to be compensated for the enhanced value of the land for duck hunting where the increased value for that particular purpose is due solely to the proximity of the land to the project. *United States v. 11.74 Acres of Land, Etc.*, 515 F.2d 1020 (8th Cir. 1975).

 While the court finds the evidence of comparable sales persuasive, the court is not in complete agreement with the government's assessment of the fair market value of the fifteen acre tract. Several of the sales offered into evidence by the govern-

ment involved tracts of land which are distinguishable from the land here in question either on the basis of the amount of land involved or the physical characteristics of property. Furthermore, the circumstances of some of the transactions offered into evidence as comparable sales, most notably, the sale of 160 acres in Mississippi County, Arkansas, in February of 1965, the sale of 80 acres in Dunklin County, Missouri, on January 25, 1971, and the sale of 686 acres in Dunklin County, Missouri, on December 29, 1972, are not sufficiently clear. The weight accorded these transactions is therefore limited to the establishment of general market trends or patterns in the geographic area and to the effect of time on the fair market value of land. However, two sales offered into evidence by the government are extremely relevant to the determination of the tract's fair market value. Those sales consist of defendant Cude's purchase of an undivided one-fourth interest in the fifteen acre tract on November 11, 1971 and defendants Sullivan's and Bright's purchase of an undivided three-fourth's interest in the fifteen acre tract on March 17, 1972. These sales are unquestionably comparable inasmuch as they involved the very same property which is the subject of this action and the purchases were relatively near the date of taking. Furthermore, while the purchasers and sellers in these transactions were acquainted, there is no real suggestion in the evidence that these purchases were anything other than arms length transactions between willing sellers and willing buyers. Under these circumstances the Court finds that these two sales provide the best evidence of the fair market value of the fifteen acre tract. Accordingly, the Court finds that the fair market value of the fifteen acre tract on the date of taking was $4,687. The Court further finds that defendant F. E. Scott had no compensable interest in the property as of the date of its taking and is therefore entitled to nothing as a result of these proceedings.

