**Bosacco v. Sherman**
**Sherman v. Bosacco**

*Robert James Jackson,* for landlord.
*Melvin G. Levy* and *Allen J. Levin,* for tenants.
LIPPINCOTT, J., April 20, 1970.—

## ADJUDICATION

### A. *Statement of Issues.*

These two equity actions were consolidated for purposes of trial and disposition. They involve the interpretation of a written lease of premises 610 Garrett Road, Upper Darby Township, Delaware County, Pa., entered into between Armand Bosacco and Hannah E. Bosacco, his wife (hereinafter called "lessors"), and Morton S. Sherman and Alan Cohen, individually and trading as "Garrett Rambler" (hereinafter called "lessees").

The first suit brought by lessors seeks a judgment declaring that the lease be terminated and the rights of the lessees forfeited. Lessors contend that a use covenant was breached when lessees discontinued

operation as a franchised "Rambler" automobile dealer, which was specified in the lease, although rent was paid and accepted by lessors for some eight months thereafter.

The second cause of action instituted by lessees requires an interpretation of an ineptly drawn provision in the lease. Lessees contend that the clause gives them an absolute option to purchase the premises at fair market value whether or not an offer is made by a third person. Their suit seeks specific enforcement of such option. Lessors, while not agreeing that lessees have any rights, by reason of the alleged forfeiture, argue that the clause at best amounts to a right of first refusal.

Several hearings have been held before the chancellor. The parties have also stipulated that depositions, certain exhibits and statements are to be considered by the court. Based upon the entire record, the chancellor, therefore, makes the following:

## B. *Findings of Fact.*

1. Lessors are the owners of premises 610 Garrett Road, Upper Darby, Delaware County, Pa., consisting of an automobile showroom, service garage and lot.

2. Effective May 1, 1965, lessors entered into a one-year written lease with lessees at a rental of $1,100 per month, which lease was renewed according to its terms for two additional terms of two years each.

3. The lease was prepared by a secretary of lessors' brother, apparently without legal advice.

4. The lease provides that lessees "agree to occupy the leased premises as a franchised 'Rambler' automobile dealer."

5. Said lease also states in paragraph 16:

"Lessor agrees that lessee shall have the right of first refusal or the first option to purchase the de-

mised premises during the term of this lease including the two (2) renewal terms set forth in paragraph 15 hereof, at the then fair market value, subject to the same terms and conditions as are acceptable to lessor from any third party. Lessor shall give lessee written notice of any offer so made which he considers acceptable, and lessee shall have sixty (60) days in which to meet said offer by a substantially similar written offer."

6. From May 1, 1965, until September 26, 1967, the premises were operated by lessees as a franchised "Rambler" automobile dealer.

7. From September 26, 1967, to January 22, 1968, lessees utilized the premises to service automobiles, sell insurance and sell used cars.

8. After January 22, 1968, the premises were used by lessees only to store automotive equipment.

9. Lessors were fully aware of the termination of the "Rambler" franchise on September 26, 1967, and the use being made of the property thereafter.

10. Lessees continued to pay rent through May 1968, which rent was accepted by lessors.

11. The subject premises are immediately adjacent to property owned by the Chrysler Motors Corporation and operated as a Chrysler-Plymouth automobile agency.

12. For many months prior to March 11, 1968, lessors had been negotiating with Chrysler Motors Corporation for the sale of the subject premises, which negotiations were known to lessees.

13. In the latter part of 1967, lessees asked lessors if they wanted to sell the premises and lessors told lessees that they wanted $200,000 for the property.

14. By letter dated March 11, 1968, lessors notified lessees that the lease was terminated because lessees were occupying the premises otherwise than as a

franchised "Rambler" dealer and that lessees should vacate.

15. Lessees by letter also dated March 11, 1968, informed lessors that they were "hereby exercising our option to purchase" in accordance with paragraph 16 of the lease.

16. On April 16, 1968, lessors executed an agreement of sale whereby they agreed to convey the premises to Chrysler Realty Corporation for $30,000, plus the conveyance of premises 6777 Market Street, Milbourne, Delaware County.

17. No notice was given by lessors to lessees of the terms of the agreement of sale either prior or subsequent to its execution, until litigation began.

18. The fair market value of the subject premises on April 16, 1968, was $200,000.

19. A cash offer substantially similar to that made by Chrysler Realty Corporation as contained in the agreement of sale dated April 16, 1968, is $200,000.

## C. *Discussion.*

Lessors leased an automobile agency to lessees in 1965 at a monthly rental of $1,100. The lease stated that the property was to be occupied as a franchised "Rambler" dealership. Although lessees' franchise terminated on September 26, 1967, this made no difference in the amicable relationship of the parties until shortly thereafter when lessors commenced negotiations with the owner of the adjacent property, Chrysler Realty Corporation, for a sale of the property. These negotiations became known to lessees, who inquired at that time whether lessors wanted to sell and were informed that the price was $200,000, which they said was "crazy", although lessors indicated that they had a party interested in buying at that price.

As the negotiations became more serious between lessors and Chrysler, a cat-and-mouse game began between lessors and lessees. By letter dated March 11, 1968, lessors notified lessees that the lease was terminated because lessees were occupying the premises other than as a franchised "Rambler" dealer, although lessors had been aware of this fact for six months and had accepted rent without protest until the date of the letter, and even continued to do so for two months thereafter. On exactly the same date, lessees wrote lessors that they were exercising their "option to purchase" for the "fair market value" of $132,000,[1] knowing full well that lessors were then negotiating in the area of $200,000. The instant suits were filed shortly thereafter seeking to enforce the respective contentions of the parties.

The first question which must be resolved is whether or not the provision in the lease stating that lessees agree "to occupy the leased premises as a franchised 'Rambler' automobile dealer" constitutes a restriction upon the use of the property. The chancellor believes not. These words are merely descriptive of the character of the premises and indicate the type of use to which they should be adapted. They impart no obligation on lessees to continue to use the premises for such purpose. The provision amounts to a covenant against a non-complying use and not a covenant to use. See Dickey v. Philadelphia Minit-Man Corporation, 377 Pa. 549, 105 A. 2d 580 (1954).

The provisions of the lease in Dickey, supra, were far more restrictive than those in the instant case. They stated that the premises were to be occupied by lessee "in the business of washing and cleaning automobiles within the scope of the business of the Philadelphia Minit-Man Corporation . . . *and for*

---

[1] This figure was even lower than their own appraisers' valuation at trial.

*no other purpose"* (Italics supplied). The lease further provided that lessor was to receive a percentage of gross sales as part of the rental. After five years, lessee ceased to wash and clean cars, but continued to pay minimum rental. On these facts, it was held that lessee did not violate the lease and there was no right to terminate even though the rental due the lessor was diminished.

In the case at bar, the premises were properly maintained and kept in good repair by lessees at all times and the rental was not decreased. Lessors were, therefore, not harmed in any way by the fact that lessees were no longer franchised by Rambler. In addition, the premises were never used for any purpose other than automotive. We accordingly find that lessors had no right to terminate the lease and reenter the premises.[2]

Furthermore, even if it may be argued that a covenant to use existed and was breached, lessors are precluded from declaring a forfeiture because of waiver. The evidence shows that lessors became aware of the fact that lessees had given up the Rambler franchise long before they declared a breach of the lease in the letter of March 11, 1968. In spite of such knowledge, lessors continued to accept rental payments of $1,100 per month for six months thereafter. In addition, assuming that the waiver only applied to breaches of the lease prior to March 11, 1968, lessors continued to accept rent for April and May 1968.

The law is clear that if a lessor elects not to reenter after declaring a breach, a waiver will be inferred by his acceptance of rent accruing after the

[2] Lessors also argue that lessees deleted the word "Rambler" from their copy of the lease and that this is a material alteration upon which lessees may not rely. We regard this argument as frivolous. It was never previously raised as an issue. There is also no evidence that lessees made the alteration fraudulently or that they rely upon it in this litigation.

breach: Meehen v. Connell Anthracite Mining Company, 318 Pa. 481, 178 Atl. 833 (1935). We thus find that lessors waived all possible breaches by accepting rent thereafter.

We next must determine the rights of the parties under paragraph 16 of the lease, which states:

"Lessor agrees that lessee shall have the right of first refusal or the first option to purchase the demised premises during the term of this lease including the two (2) renewal terms set forth in paragraph 15 hereof, at the then fair market value, subject to the same terms and conditions as are acceptable to lessor from any third party. Lessor shall give lessee written notice of any offer so made which he considers acceptable, and lessee shall have sixty (60) days in which to meet said offer by a substantially similar written offer."

Lessees contend that this clause gives them two distinct purchase rights: (1) a right of first refusal to purchase the demised premises on the same terms and conditions as are acceptable to lessors from a third party; and (2) an absolute option to purchase the demised premises at the fair market value.

We do not so construe this clause. While ineptly drawn, the chancellor interprets the paragraph in light of its common-sense meaning. Read as a whole, we believe that it gives lessees a right of first refusal and option to purchase the property on the same terms as are acceptable to lessors from a third party. The words "then fair market value" must be construed as equivalent to the offer which is received by and acceptable to lessors and the intention of the parties was to give lessees the right to fairly meet any such offer.

The evidence indicates that the parties themselves so construed the lease. Thus, lessees on several occasions inquired of lessors if they had yet received an

offer from Chrysler and lessors indicated that they would submit such an offer when received, but never did. This testimony was not denied by lessors. Such inquiry was unnecessary if the lease was intended to mean what lessees now contend.

The evidence also shows that the offer received from Chrysler was never submitted to lessees as required by paragraph 16 of the lease. We are holding by this adjudication that lessees must be given the right under the lease to match this offer by making a substantially similar one. In order to determine what such a substantially similar cash offer is (equivalent to the fair market value of the property), the chancellor has carefully considered all of the evidence presented by expert witnesses and others in order to determine fair market value. Keeping in mind the applicable legal principles, the chancellor believes that the fair market value at the time the Chrysler offer was received was $200,000.

## D. *Conclusions of Law.*

1. The court has jurisdiction over the parties and the subject matter.

2. The lease agreement is and remains a valid contract.

3. There was no breach by lessees of the provision in the lease stating that they should occupy the premises as a franchised "Rambler" automobile dealer.

4. If any such breach of the lease did occur, it was waived by lessors in accepting rent.

5. Lessors have failed to submit to lessees notice of the offer received by them from Chrysler Realty Corporation.

6. Lessees have failed to submit an offer to purchase the premises substantially similar to that received from Chrysler Realty Corporation.

### E. *Decree Nisi.*

Now, November 21, 1969, it is ordered, adjudged and decreed that:

1. Lessees shall have 20 days following the entry of a final decree within which to submit a written offer to lessors to purchase premises 610 Garrett Road, Upper Darby Township, Delaware County, Pa. The terms of said offer shall include: (a) a consideration of $200,000, and (b) substantially such other provisions as are contained in the agreement submitted by Chrysler Realty Company, dated April 16, 1968.

2. If such an offer is not received within said period of 20 days by lessors, all rights of lessees under the lease in controversy shall terminate.

3. If such an offer is submitted by lessees to lessors, lessors shall convey the property to lessees in accordance with the terms thereof.

4. Upon proof of the submission of or failure to submit such offer, either party may apply for the entry of such supplemental final decree or decrees as may be required to effectuate a conclusion of the matter or as the interests of justice may demand.

5. Each party shall bear his or her own costs.

### ORDER

The prothonotary is directed to give notice immediately to the attorneys of record of the filing of the above decree nisi; if no exceptions are filed thereto 20 days after service of such notice, the prothonotary shall enter upon praecipe the said decree nisi as a final decree.

---

### OPINION SUR EXCEPTIONS

Both sides have filed exceptions to the chancellor's adjudication. Those entered by lessors (Bosacco) were

stated at oral argument to be "for the record"; we conclude that they are without merit. The sole exception of lessees (Sherman and Cohen) is to a determination of fair market value by the chancellor, although their chief argument now questions the chancellor's interpretation of the lease agreement, to which no exceptions were filed.

The paragraph of the lease requiring explication provides:

"Lessor agrees that lessee shall have the right of first refusal or the first option to purchase the demised premises during the term of this lease including the two (2) renewal terms set forth in paragraph 15 hereof, at the then fair market value, subject to the same terms and conditions as are acceptable to lessor from any third party. Lessor shall give lessee written notice of any offer so made which he considers acceptable, and lessee shall have sixty (60) days in which to meet said offer by a substantially similar written offer."

Lessees contend that this clause gives them two separate rights: that of first refusal and an absolute option. The chancellor, however, specifically construed the clause to mean that ". . . it gives lessees a right of first refusal and option to purchase the property on the same terms as are acceptable to lessors from a third party. The words 'then fair market value' must be construed as equivalent to the offer which is received by and acceptable to lessors and the intention of the parties was to give lessees the right to fairly meet any such offer."

No exception was taken to this finding by the chancellor. Lessees' present argument contending that the chancellor erred in so interpreting the lease is therefore improper under Pa. R. C. P. 1518(a), which provides that ". . . exceptions may be filed by any party to . . . findings of fact, to conclusions of

law, to the decree nisi, . . . to a failure or refusal to find any matter of fact or law substantially as requested. *Matters not covered by exceptions are deemed waived, . . .*" (Italics supplied.)

In any event, we find no error in the chancellor's interpretation of this paragraph. Lessees argue that no meaning has been given to the words "or the first option to purchase" contained in the disputed paragraph. On the contrary, the chancellor construed these words as being synonymous with "the right of first refusal." Furthermore, as found by the chancellor, the uncontradicted testimony shows that the parties themselves similarly construed the paragraph. The obvious intention was to give lessees the protection of continuing with their business enterprise if lessors decided to sell, by permitting them to match any offer received by lessors.

The only specific exception taken by lessees to any of the chancellor's findings was to finding of fact 18, wherein the chancellor found that the fair market value of the property was $200,000. Lessees complain that this finding is erroneous in that there was no competent evidence to support such an evaluation. We disagree.

The chancellor, of course, is not bound by the testimony of any witness, as lessees contend, but may accept that which he believes to be credible. The expert witness for lessors stated that the highest and best use of the property would be to combine it with the Chrysler property next door, and that the value for this purpose would be $210,000. Lessees' own expert also agreed that this would be the highest and best use, and that its value in such instance would be in excess of the valuation he placed upon it.

In establishing fair market value, all relevant factors must be considered, and if it is shown that a combination of properties is feasible and reasonably

probable, such use may be considered in determining fair market value. See United States v. Powelson, 319 U. S. 266, 63 S. C. 1047, 87 L. Ed. 1390 (1943); also see the Eminent Domain Code, 26 PS §1-603, in which the "highest and best reasonably available use of the property" may be considered in determining fair market value. In the present case, the combination of the subject property and the Chrysler premises clearly meets the tests of feasibility and probability.

Value judgments are not made in a vacuum. We are not required to hide our eyes from things that exist. Here, two properties situate side-by-side in a heavily commercial section of suburban Delaware County are both being used as automobile agencies. Each is too small for full realization of its potential and no one disputes the obvious fact that each would be of greater value itself if joined with the other. This is not a case of conjuring up a remote possible use for this property, since an actual agreement of sale resulting in a consolidation of properties is in existence. To ignore these facts would be unrealistic and we agree that the chancellor properly applied the correct criteria in reaching his conclusion.

There is also other evidence in the record supporting the chancellor's finding of $200,000 as being the fair market value of the property. For example, the owner indicated that he previously told lessees he wanted this amount for the property, thus giving his opinion of value: Williams v. Department of Highways, 423 Pa. 219, 228, 223 A.2d 865 (1966), and cases cited therein. And it also appeared that the owner of an almost identical property on the opposite corner from the subject premises had rejected an offer of $200,000. We therefore conclude that there is ample evidence to support the chancellor's finding that the fair market value of the property is $200,000.

Furthermore, a determination of fair market value was actually superfluous under the chancellor's finding that lessees only have a right of first refusal, i. e., the right to make a "substantially similar written offer," as provided in the lease. The chancellor found that Chrysler made an offer of land and cash as contained in the agreement of sale dated April 16, 1968 (finding of fact 16) and that a substantially similar cash offer to the Chrysler offer is $200,000 (finding of fact 19). Neither these findings nor the finding that lessees' only right under the lease is to make a similar offer was excepted to by lessees. Hence, lessees not only have no standing to complain, but also no basis, since the decree entered by the chancellor gives them the right to match the offer of Chrysler by making a substantially similar one in cash. This is clearly what was intended by the parties, and the chancellor's conclusions and proposed decree fully protect lessees' interest.

We, therefore, enter the following:

### Final Decree

Now, April 20, 1970, it is ordered and decreed that:

A. The exceptions filed by Armand Bosacco and Hannah E. Bosacco, his wife, be and they are hereby dismissed.

B. The exceptions filed by Morton S. Sherman and Alan Cohen, individually and trading as "Garrett Rambler," be and they are hereby dismissed.

C. The findings of fact, conclusions of law and adjudication of the chancellor are approved and adopted by the court en banc.

D. It is further ordered, adjudged and decreed that:

1. Lessees shall have 20 days following receipt of notice of this final decree within which to submit a written offer to lessors to purchase premises 610

Garrett Road, Upper Darby Township, Delaware County, Pa. The terms of said offer shall include: (a) a consideration of $200,000; and (b) substantially such other provisions as are contained in the agreement of sale submitted by Chrysler Realty Company, dated April 16, 1968.

2. If such an offer is submitted by lessees to lessors, lessors shall convey the property to lessees in accordance with the terms thereof.

3. If such an offer is not received within said period of 20 days by lessors, all rights of lessees under the lease in controversy shall terminate.

4. Upon proof of the submission of or failure to submit such offer, either party may apply for the entry of such supplemental final decree or decrees as may be required to effectuate a conclusion of the matter or as the interests of justice may demand.

5. Each party shall bear his or her own costs.

## Order

The prothonotary is directed to give notice immediately to the attorneys of record of the filing of the above final decree.